Hearing Date and Time: October 26, 2022 at 10:00 a.m. (Prevailing Eastern Time)
Objection Deadline: October 14, 2022 at 4:00 p.m. (Prevailing Eastern Time)
Docket No. 2

ELLEN F. ROSENBLUM  OSB #753239
Attorney General
CAROLYN G. WADE  OSB #832120
Senior Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, OR  97301-4096
Telephone: (503) 934-4400
Facsimile: (503) 373-7067
E-mail: carolyn.g.wade@doj.state.or.us

Attorneys for State of Oregon

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

**In re**

**ENDO INTERNATIONAL, plc,** *et al.,*

        **Debtors[1].**

------------------------------------------------------------x

**ENDO INTERNATIONAL, plc,** *et al.,*

        **Plaintiffs,**

        **v.**

**COMMONWEALTH OF KENTUCKY,** *et al.,*

        **Defendants.**

------------------------------------------------------------x

**Chapter 11**

**Case No. 22-22549 (JLG)**

**(Jointly Administered)**

**Adv. Proc. No. 22-07039 (JLG)**

### DEFENDANT STATE OF OREGON'S OBJECTION TO
### DEBTORS' MOTION FOR PRELIMINARY INJUNCTION

COMES NOW, the State of Oregon, a defendant in the above-captioned adversary

proceeding, and hereby objects to the debtors' Motion for Preliminary Injunction [Adv. D.I. 2].

---

[1] The last four digits of Debtor Endo International plc's tax identification number is 3755. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

# INTRODUCTION

## Scope of § 362(b)(4)

The filing of a bankruptcy petition creates a stay (the "automatic stay") of certain proceedings or acts against the debtor or against the property in the bankruptcy estate. 11 U.S.C. § 362(a)[2]. Of significance is subsection § 362(a)(1), which prohibits

> the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have commenced before the commencement of the case under this title.

A bankruptcy filing would prohibit the State from continuing to prosecute pending cases or initiating new cases against a debtor after the bankruptcy was filed but for the police and regulatory exception to the automatic stay, an explicit exception to the automatic stay which permits the State to continue to exercise its police or regulatory power. § 362(b)(4).

Despite a pending bankruptcy, a governmental unit is free to file or continue litigating "*an action or proceeding . . . to enforce such governmental unit's police or regulatory power*" (emphasis added).[3]    The legislative history of the exception expressly provides that "where a governmental unit is suing a debtor to prevent or stop a violation of fraud, environmental protection, consumer protection, safety, or other similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed."[4]

The Fifth Circuit noted the basis for this exception: "[it] discourages debtors from

---

[2] All references to statutory sections hereinafter or to the Bankruptcy Code are to sections found in Title 11 of the United States Code, unless otherwise noted.

[3] 11 U.S.C. § 362(b)(4) provides that filing a bankruptcy proceeding does not operate as a stay "under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of or continuation of an action or proceeding by a governmental unit...to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in a action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power."

[4] H.R. No. 95-595, 95 Cong., 1st Sess. 342-3 (1977); S.R. No. 95-989, 95th Cong., 2d Sess. 51-2 (1978); *In re Halo Wireless*, 684 F.3d 581, 587 (5th Cir. 2012).

submitting bankruptcy petitions either primarily or solely for the purpose of evading

impending governmental efforts to invoke the governmental police powers to enjoin or deter

ongoing debtor conduct which would seriously threaten the public safety and welfare." *In re*

*Halo Wireless, Inc.*, 684 F.3d 581, 588 (5th Cir. 2012) (quoting *In re McMullen*, 386 F.3d 320,

324-25 (1st Cir. 2004).   In *Halo*, the Fifth Circuit also recognized that

> the automatic stay and its exception present two different, and at
> times competing, policies.  On the one hand, the stay aims to
> protect debtors and creditors during the pendency of a bankruptcy
> proceeding to ensure that debtors get appropriate relief and that
> creditors receive payment in a fair and orderly manner.  On the
> other hand, the exception to the stay helps to ensure that debtors
> do not use a declaration of bankruptcy to avoid the
> consequences of their actions that threaten the public interest.

*Halo Wireless,* 684 F.3d at 588.

The automatic stay triggered by a defendant's bankruptcy filing does not prevent a state

trial court from hearing a police or regulatory matter pending before it, by virtue of the police or

regulatory exception to the stay found at § 362(b)(4). The primary issue the court faces is

typically whether an action qualifies as "police or regulatory" for purposes of § 362(b)(4).

There are two alternative tests for determining whether a governmental unit's action

qualifies as enforcement of its police or regulatory power – either of which, if satisfied, qualifies

the action for the stay exception. *City & County of San Francisco v. PG & E Corp.*, 433 F.3d

1115, 1124 (9th Cir. 2006). The first of those tests (called the "pecuniary interest test")

essentially turns on whether the government's primary objective is its own pecuniary (rather than

the public) interest. *In re Halo Wireless, Inc.*, 684 F.3d 581, 588 (5th Cir. 2012). The second

test, called the "public policy" test, turns on whether the State is pursuing private interests or the

public policy interests.  *Id.; see also Gandy,* 327 B.R. at 803-04; *Nat'l Labor Relations Bd. v.*

*Edward Cooper Painting, Inc.*, 804 F.2d 934, 942 (6th Cir. 1986).

The pecuniary interest test requires the court to determine whether the governmental unit

is pursuing a matter of public interest rather than advancing its own pecuniary interest.[5] The government may seek a monetary award, provided it is part of its enforcement efforts (*e.g.*, fines or penalties for violations of law) and not an attempt to collect money damages that do not arise from an exercise of a governmental unit's police or regulatory power (*e.g.* fees or contract damages). If money damages are simply ancillary to the governmental unit's enforcement of its police or regulatory power, then the government can proceed to establish (but not collect) its judgment. *Halo*, 684 F.3d at 588; *SEC. v. Brennan*, 230 F.3d 65, 71-73 (2d Cir. 2000); *Commonwealth Oil Refining Co. v. EPA (In re Commonwealth Oil Refining Co.)*, 805 F.2d 1175, 1186 (5th Cir. 1986), *cert. denied*, 483 U.S. 1005 (1987).

As noted above, a governmental unit is free, in connection with an enforcement action, to fix civil penalties related to the debtor's conduct. *California ex rel. Brown v. Villalobos*, 453 B.R. 404, 413 (D. Nev. 2011); *SEC v. Bilzerian*, 131 F. Supp.2d 10, 14 (D. D.C. 2001). The government may not, however, seek to collect the money judgment without Bankruptcy Court authorization.[6]

By contrast, if the government sues for breach of contract or for unpaid fees owed to the government, such actions are stayed (as would any other creditor's efforts) because the government in that instance is acting in its own pecuniary interest.

Under the second (the so-called "public policy"[7]) test, the court must determine whether the proceeding is designed to "effectuate public policy" rather than to "adjudicate private rights."[8] Effectuation of public policy is the key to whether an action is excepted from the stay under § 362(b)(4). *Halo*, 684 F.3d at 588; *Nat'l Labor Relations Bd.*, 804 F.2d at 934. The

---

[5] *Halo*, 684 F.3d at 588; *Gandy,* 327 B.R. at 803; *In re Commonwealth Co.*, 913 F.2d 518, 523 (B.A.P. 8th Cir. 1990). *In re Dunbar*, 235 B.R. 465, 471 (B.A.P. 9th Cir. 1999); *In re Charter First Mortgage, Inc.*, 42 B.R. 380, 382 (Bankr. D. Or. 1984).

[6] "A state court may liquidate the claim and enter a judgment, but the governmental unit is stayed from enforcing the money judgment against a debtor without an order from the Bankruptcy Court." *Gandy*, 327 at 803. *See also Halo*, 684 F.3d at 587 ("The exception does not allow enforcement of a money judgment against the debtor; however, at most, a money judgment may be entered.")

[7] *Nat'l Labor Relations Bd.,* 804 F.2d at 942.

[8] *Halo*, 684 F.3d at 588; *Gandy*, 327 B.R. at 803-04; *Dunbar,* 235 B.R. at 471 (citations omitted); *Charter First Mortgage*, 42 B.R. at 383.

government is unquestionably effectuating public policy when it is suing a debtor "to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or . . . to fix damages for violation of such a law" and is thus exempt from the automatic stay. *Gandy,* 327 B.R. at 804 (citing *Commonwealth Oil*, 805 F.2d at 1182-83 (internal citations omitted)).[9]

The police and regulatory power exception to the automatic stay includes proceedings to prevent or stop (as well as fix penalties for) violations of health protection laws. According to § 362(b)(4)'s legislative history, the phrase "policy or regulatory power" includes the enforcement of laws enacted to protect the public's health. *Commonwealth Oil,* 805 F.2d at 1182-83 (5th Cir. 1986). Several courts have applied the police and regulatory power exception to the automatic stay in the healthcare context. *See*, *In re RGV Smiles by Rocky L. Salinas, D.D.S P.A.*, 626 B.R. 278 (Bankr. S.D.TX. 2021).

The State is not only free to commence or continue an action to enforce its police or regulatory power, it may also enforce a judgment for *injunctive* relief. Section 362(b)(4) explicitly provides that the automatic stay does not act as a stay of the "enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's police or regulatory power." A continuing civil enforcement proceeding brought by a governmental unit and the enforcement of *injunctive* relief obtained therein are exempted from the automatic stay provision of § 362(a).[10]

While the government can obtain and enforce injunctive relief, the government may obtain but *not* enforce (*i.e.,* collect) a money judgment against a debtor. Congress considers the

---

[9] Also citing the legislative history found at S. Rep. No. 989, 95th Cong., 2d Sess. 52 (1978) ("Senate Report"), *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5838; H.R. Rep. No. 595, 95th Cong., 1st Sess. 340 (1977) ("House Report"), *reprinted in* 1978 U.S. Code Cong. & Admin. News 5963, 6298.

[10] *SEC v. First Fin. Group of Texas*, 645 F.2d 429 (5th Cir. 1981) (emphasis in original); *United States v. F.E. Gregory & Sons*, 58 B.R. 590 (W.D. Pa. 1986) (the government's post-petition action seeking an injunction ordering debtor to perform reclamation work at an abandoned mine site fell within § 362(b)(4) and therefore did not constitute an action for a money judgment although debtor would have to expend money in the clean-up).

government to be like any other creditor in that regard. The fact that Congress made only *enforcement* of a money judgment subject to the automatic stay indicates strongly that mere *entry* of the judgment was not intended to be proscribed; this implication is also entirely consistent with the legislative history. *United States v. Nicolet*, 857 F.2d 202 (3rd Cir. 1988). Further, as the Fifth Circuit noted,

> [q]uite separate from the entry of a money judgment, however, is a proceeding to *enforce* that money judgment. The paradigm for such a proceeding is when, having obtained a judgment for a sum certain, a plaintiff attempts to seize property of the defendant in order to satisfy that judgment. It is this seizure of a defendant-debtor's property, to satisfy the judgment obtained by a plaintiff-creditor, which is proscribed by subsection 362(b)(5).[11]

*Commonwealth Oil*, 805 F.2d at 1186, n. 12 (quoting *Penn Terra Ltd. v. Dept. of Environmental Resources*, 733 F.2d 267, 275 (3rd Cir. 1984) (emphasis in original)).[12]

Additionally, the Fifth Circuit has ruled that simply because a debtor must spend money to comply with an injunction does not transform an injunction into a money judgment which cannot be enforced without further court order. In *Commonwealth Oil*, the Fifth Circuit observed:

> Were we to find that any order which requires the expenditure of money is a 'money judgment,' then the exception to section 362 for governmental police action . . . would . . . be narrowed into virtual nonexistence . . . . [W]e cannot ignore the fundamental fact that, in contemporary times, almost everything costs something.[13]

The court in *Commonwealth Oil* examined whether enforcement of the injunction in question would constitute enforcement of a money judgment in violation of the automatic stay:

> As traditionally understood, a money judgment "need consist of only two elements: (1) an identification of the parties for and

---

[11] Section 362(b)(5) was deleted and merged into subsection (b)(4) by Pub. L. No. 105-277, effective October 21, 1998. For purposes of this memorandum, therefore, any references in cases to § 362(b)(5) apply equally to § 362(b)(4).

[12] *Murray v. United States Department of Treasury (In re Murray)*, 128 B.R. 517, 519 (Bankr. N.D. Tex. 1991) (Defendant's administrative proceeding was excepted from the automatic stay because it was "not an action to collect or enforce a judgment," but was "one to fix and ascertain . . . liability."); *In re Compton Corp.*, 90 B.R. 798 (N.D. Tex. 1988), *appeal dismissed* 889 F.2d 1104 (5th Cir. 1989); *City of New York v. Exxon Corp.*, 932 F.2d 1020 (2nd Cir. 1991).

[13] *Commonwealth Oil*, 805 F.2d at 1186, quoting *Penn Terra*, 733 F.2d at 277-78.

> against whom judgment is being entered, and (2) a *definite* and *certain* designation of the amount which plaintiff is owed by defendant . . . ." *Penn Terra,* 733 F.2d at 275 (emphasis in original) . . . Just as the Third Circuit found in *Penn Terra* with respect to proceedings initiated by Pennsylvania's Department of Environmental Resources, we find that, at least as a matter of form, the EPA's action is not a proceeding to enforce a money judgment as that term is traditionally understood. Furthermore, the EPA's action which is clearly not, in form, an action to enforce a money judgment, is also not, in substance, an action to enforce a money judgment.

*Commonwealth Oil,* 805 F.2d at 1186.

The policy behind the police or regulatory exception to the automatic stay is self-evident and helps state courts exercise their power to determine the scope of the stay. Congress wanted government agencies to be free to continue to exercise their police or regulatory powers so that defendants could not use bankruptcy to exempt themselves from applicable laws.[14]  Because of this important exception to the automatic stay, the government can pursue actions to protect the public through consumer protection statutes and thus avoid making the bankruptcy court a haven for wrongdoers.[15]  *In re Kupperstein*, 994 F.3d 673 (1st Cir. 2021).

## BACKGROUND

Oregon is facing an opioid crisis.  (*State of Oregon v. Endo Health Solutions, Inc. and Endo Pharmaceuticals, Inc.*, Oregon Circuit Court, Multnomah County, Case No. 21CV43733, Am. Compl. ¶ 1 (June 9, 2022), attached hereto as Exhibit 1 for the court's convenience ("Oregon Compl.")  Oregon has one of the highest rates of prescription opioid misuse in the

---

[14] In fact, Congress specifically provided that debtors and trustees remain subject to applicable state law while in bankruptcy.  28 U.S.C. § 959(b) states that

> Except as provided in section 1166 of Title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

*See also In re HLS Energy*, 151 F.3d 434 (5th Cir. 1998).

[15] *SEC v. First Fin. Group of Texas*, 645 F.2d 429 (5th Cir. 1981); C*ajun Power Coop., Inc. v. Mabey*, 185 F.3d 446, 453 (5th Cir. 1999) (trustee must manage property according to laws of the state in which such property is situated pursuant to 28 U.S.C. § 959(b)). *See also Brennan*, 230 F.3d at 71 (citations omitted); *In re Commonwealth Co., Inc.,* 913 F.2d 518, 527 (B.A.P. 8th Cir. 1990) (citations omitted); *Gandy,* 327 B.R. at 801-02.

country.  (*Id.* ¶ 2.)  In 2018, Oregon providers wrote 57.3 opioid prescriptions for every 100 persons, higher than the national average.  (*Id.*)  Opioid-related deaths have been rising rapidly in Oregon, increasing 40% from 2019 to 2020.  (*Id.*)  And the economic cost has been and will continue to be extraordinary.  From 2007 to 2040, the opioid epidemic will cost Oregon approximately $13 billion in health care, criminal justice, child welfare, and lost labor costs.  (*Id.* ¶¶ 147-51.)

Debtors Endo Health Solutions, Inc. and Endo Pharmaceuticals, Inc. contributed to the opioid epidemic in Oregon.  For more than a decade, Endo deceptively, misleadingly, and falsely marketed dangerous opioids in Oregon.  (*Id.* ¶ 11.)  In its amended complaint, Oregon alleges, among other things, that Endo: (1) falsely asserted that its opioids created less euphoria than other opioids (*id.* ¶ 30); (2) falsely claimed that its opioids have fewer side effects (*id.* ¶ 32); (3) falsely stated that its opioids allowed patients to function normally in their usual activities of daily life (*id.* ¶ 33); (4) used front organizations and individuals to disseminate deceptive and misleading information (*id.* ¶¶ 46-60); (5) knowingly promoted its opioids to dangerous prescribers (*id.* ¶¶ 79-88); (6) targeted seniors for promotion of opioids (*id.* ¶ 77); and (7) made false claims about its opioids' abuse deterrence properties (*id.* ¶¶ 114-120).

Oregon also alleges that Endo deceived Oregon's state agencies.  Endo repeatedly made materially false representations on renewal applications to the Oregon Board of Pharmacy.  (*Id.* ¶¶ 138-145.)  And, when Oregon launched an investigation into Endo's conduct in 2016, Endo's counsel falsely asserted that data responsive to Oregon's investigative demands did not exist when, in fact, it did.  (*Id.* ¶ 15.)

To hold Endo accountable for its conduct, the State of Oregon, through its Attorney General, has brought statutory claims seeking civil penalties and a permanent injunction under Oregon's Unlawful Trade Practices Act, Elderly Persons and Persons with Disabilities Abuse Prevention Act, and Racketeer Influenced and Corrupt Organizations Act.  The Multnomah County Action also sought damages arising from Endo's negligence and public nuisance.

Oregon's claims represent assertion of the State's core police powers, brought exclusively under the laws of the State of Oregon.

Debtors Endo Health Solutions, Inc. and Endo Pharmaceuticals, Inc., and their related companies (hereinafter "Endo") filed voluntary petitions in chapter 11 on August 16, 2022, followed by the complaint in this adversary proceeding on September 9, 2022, asking this court to enjoin pending actions and administrative proceedings brought by governmental agencies for 270 days.

Rather than acknowledging that Congress formulated the Bankruptcy Code intending that governmental agencies be permitted to proceed with matters in the proper exercise of their police powers, these debtors declared that they "do not have the resources, time, or practical ability to litigate the scope of the automatic stay and its application . . . ." and asked the court to jump directly to § 105(a) to give them a breathing spell far beyond that which the automatic stay contemplates.

## LEGAL ARGUMENT

Taking a page from the debtors in the Purdue Pharma[16] case, debtors here filed a bankruptcy petition and almost immediately filed this adversary proceeding naming 3198 (presumably all) the governmental actors then seeking any sort of redress against any of the debtors as defendants. The prayer requested that this court enjoin the commencement or continuation of any proceeding against the debtors for a period of 270 days.

Immediately thereafter, the debtors as plaintiffs filed this motion seeking an injunction on essentially the same terms, to be heard on the shortened timeframe of Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Procedure (the Bankruptcy Rules) and ostensibly justified by section 105(a) of the Bankruptcy Code.

The proposed order tendered with the motion for preliminary injunction is problematic and will be addressed in more detail below. We note, however, that it goes far beyond an order

---

[16] *In re Purdue Pharmaceuticals, L.P. et al.*, Case No. 19-23649-RDD, United States Bankruptcy Court for the Southern District of New York.

granting a preliminary injunction against the defendants to the adversary proceeding, including the Voluntary Operating Injunction.

**Police Power Exception**

As discussed above, the decision of whether to issue an injunction precluding a governmental actor from continuing its exercise of valid police powers starts with a determination of whether the exception to the automatic stay applies. This is an important step and one that should not be overlooked on the way to what appears to be the dominant question of irreparable harm. From the first version of the Bankruptcy Code, enacted in 1978,[17] there has been a provision excepting actions of governmental entities from the effect of the automatic stay, because what those entities do is vital. Protecting citizens is not an activity that was intended to be automatically stayed, and the court should bear that in mind when determining whether to issue an injunction under § 105. To be able to enjoin under § 105(a), the court must apply the standards used in testing the applicability of the police power exception: is the Multnomah County Action a matter filed for a pecuniary purpose or one filed to effectuate public policy?

The Multnomah County complaint asked for the following monetary recovery: for its past violations of Oregon's Unlawful Trade Practices Act by employing unconscionable tactics in connection with the sale of opioids, $25,000 per violation (Oregon Compl. ¶¶ 161-64); through causing confusion as to the extent of FDA approval of the reformulated Opana ER, $25,000 per violation (*id.* ¶¶ 165-68); and falsely representing that Endo's opioids had qualities they did not have, also $25,000 per violation. (*Id.* ¶¶ 169-72.) For its past violations of the Oregon Racketeer Influenced and Corrupt Organizations Act, by committing crimes of falsification, fraudulently obtaining a signature, and wire fraud, Oregon sought civil forfeiture pursuant to ORS 166.725(2) of all money and property Endo has obtained from its violations of ORS 166.720(3), from January 2007 to the present, including all revenue generated from the sale of opioids in Oregon. (*Id.* ¶¶ 174-183.) In addition, the Attorney General sought a civil penalty

---

[17] Bankruptcy Reform Act of 1978 (Pub.L. 95–598, 92 Stat. 2549, November 6, 1978).

of up to $250,000. (*Id.* ¶ 184.)   For its past violations of ORS 124.100 through 124.125, Abuse

of Vulnerable Persons by its reckless, false, and deceptive marketing tactics, specifically

targeting seniors.  Oregon again seeks a civil penalty of up to $25,000 for each violation.  (*Id.* ¶¶

187-190.)  The complaint included a claim for relief for negligence, claiming damages of up to

$1 billion.  The complaint included a claim for relief based on public nuisance, also claiming

damages of up to $1 billion.  All statutory claims included requests for attorney fees and costs of

investigation.

To allow a workable compromise with debtors, Oregon will request that the Multnomah

County Circuit Court allow it to file a second amended complaint that deletes the claims for

negligence and nuisance, leaving only the civil forfeiture claim and the civil penalties as

monetary demands.  So, removing the negligence and public nuisance claims, do the first three

claims for relief qualify under the police power exception?

> To determine whether a particular government action is within the "police power" exception, courts apply two tests, the pecuniary purpose test and the public policy test. *N.L.R.B. v. Continental Hagen Corp.*, 932 F.2d 828, 833–34 (9th Cir.1991); *Word v. Commerce Oil Co. (In re Commerce Oil Co.)*, 847 F.2d 291, 295 (6th Cir.1988); *In re Selma Apparel Corp.*, 132 B.R. 968, 969 (S.D.Ala.1991); *United States v. Seitles,* 106 B.R. 36, 38–39 (S.D.N.Y.1989). Under the pecuniary purpose test, a court must focus on whether the government action "relates primarily to the protection of the government's pecuniary interest in the debtor's property, and not to matters of public safety." *Commerce Oil*, 847 F.2d at 295.

*In re Synergy Dev. Corp.*, 140 B.R. 958, 960 (Bankr. S.D.N.Y. 1992).  To determine whether the

government has brought a particular suit to "enforce [its] police or regulatory powers," courts

look to the purpose of the law and ask "whether the government seeks to effectuate public policy

or to adjudicate private rights."  *Lockyear v. Mirant Corp.*, 398 F3d 1098, 1107 (9th Cir.

2005)*.*  The focus of a court's inquiry is not on the subjective motivation for the state in bringing

the claim; the focus is on the objective purpose of the laws or regulations the governmental unit

seeks to enforce.  *See In re General Motors LLC Ignition Switch Litig.*, 69 F Supp 3d 404, 411

(S.D.N.Y. 2014) (discussing *Board of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502

US 32, 40 (1991)).  The exception can still apply even if the government seeks damages or penalties.  *In re Universal Life Church*, 128 F3d 1294, 1299 (9th Cir 1997).

The State's claims in the Multnomah County Action fall squarely within that exception because the laws the State seeks to enforce all allow for protection of public health, welfare, and consumer protection.  The Unlawful Trade Practices Act was "enacted as a comprehensive statute for the protection of consumers from unlawful trade practices," and, consistent with that purpose, the UTPA authorizes public enforcement of its provisions.  *State ex rel. Rosenblum v. Johnson & Johnson*, 275 Or App 23, 33 (2015).  The State's action therefore falls under the exception to automatic stay under § 362(b)(4).  *See In re Nelson*, 240 B.R. 802, 803 (Bankr. ME 1999) (State of Maine's complaint alleging violations of Maine's Unfair Trade Practices Act and Consumer Solicitations Sales Act were excepted from automatic bankruptcy stay under section 362(b)(4)).

The purpose of ORICO is to curb organized criminal activity, including white collar crimes.  *State v. Walker*, 356 Or 4, 20 (2014).  The legislative history of ORICO shows that the legislature was concerned with broad categories of public harm that could be caused by such organized crime—for example, "frauds that cause businesses to go bankrupt and the elderly to lose their life savings."  *Walker,* at 17 (internal quotation omitted); *see also Herman v. Brown*, 160 BR 780, 782-84 (ED La 1993) (holding that Louisiana Insurance Commissioner's RICO action fell within the exception to an automatic stay set out in § 362(b)(4)).

Similarly, the Elder Abuse Act provides a mechanism for the State to protect the public interest in preventing abuse.  See *Bishop v. Waters*, 280 Or App 537, 548 (2016) (the State, in bringing an action under ORS 124.125, "represents the public's interest in punishing and preventing financial abuse of all vulnerable persons [in Oregon].").  That purpose falls within the State's police power and, accordingly, this action is not automatically stayed.  See *In re Nelson*, 335 B.R. 740, 751 (Bankr. KS 2004) (holding that private litigant's action under Kansas's Protection from Abuse Act "closely resembles . . . a proceeding to enforce a government's police power to provide for the safety of its citizens" and falls under the exception found in

§ 362(b)(4)); *In re Tauscher*, 7 B.R. 918 (Bankr. E.D. WI 1981) (United States Secretary of Labor permitted to continue action for civil penalties for violations of child labor laws).

This is not a case where Oregon is seeking to exercise police power to collect a pre-petition debt; it has no pecuniary interest in the debtor's property—it is obviously the kind of consumer protection case that Congress had in mind when drafting the exception.

> Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such law, the action or proceeding is not stayed under the automatic stay.[18]

Under the public policy test, a court must decide whether the proceedings seek to adjudicate private rights or those that effectuate public policy. *Commerce Oil*, 847 F.2d at 295.

The most important part of the Multnomah County Action is the non-monetary prayer, where Oregon asks for an injunction prohibiting Endo from continuing to market its opioids in Oregon. There is a further request for an injunction prohibiting Endo from continuing to market its opioids to individuals over 65 or disabled individuals in Oregon. Although Endo has presented itself as having stopped marketing opioids, it continues to sell Percocet in Oregon. These injunctions are necessary and the proceedings to obtain them seek to effectuate public policy. They are not barred by the automatic stay.

## Section 105(a) Injunction

Debtors have not met their burden to obtain an injunction under § 105(a). Notwithstanding the almost ubiquitous appearance of such injunctions in recent cases, it is a heavy burden debtors must meet. In order to obtain a preliminary injunction extending the automatic stay under section 105(a) of the Bankruptcy Code, a debtor must demonstrate that (1) there is a likelihood of a successful reorganization; (2) there is imminent, irreparable

---

[18] H.R.Rep. No. 595, 95th Cong., 1st Sess. 343 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6299; S.Rep. No. 989, 95th Cong., 2d Sess. 52, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5838.

harm to the estate in the absence of an injunction; (3) the balance of harms tips in favor of the moving party, and (4) whether the public interest weighs in favor of an injunction.  *In re Lyondell Chemical Co*., 402 B.R. 571, 588-89 (Bankr. S.D.N.Y. 2009).

Likelihood of Successful Reorganization

The success of debtors' nascent reorganization is difficult to forecast; they have packaged a deal wherein all their assets will be transferred to selected creditors at a pre-negotiated price, yet the need for the sale and the need for the bankruptcy at all are not evident to outside points of view.  Endo itself has not been particularly accurate in anticipating its performance.  For instance, in early May 2022, Endo issued guidance about its anticipated second quarter 2022 financial performance in its first quarter financial report,[19] which the second quarter's financial report[20] showed was very pessimistic:

|  | Anticipated Second Quarter 2022 | Actual Second Quarter 2022 | % Outperformance |
|---|---|---|---|
| Revenue | $500-$525M | $569,114,000 | 11% |
| Adjusted EBITDA | $110-$125M | $160,206,000 | 36% |

So, while on the one hand, the actual good performance is a fact to be lauded, it casts doubt on the debtors' ability to predict the future.  The debtors entered this bankruptcy with over a billion dollars in cash[21]—hardly typical debtors *in extremis*.  Here the question must be asked—what is a "successful reorganization" when, as the Ad Hoc Group of Unsecured Noteholders has pointed out in its objection to the cash collateral motion [D.I. 65]:

- Endo is not strapped for necessary cash;

- Endo has not defaulted on any obligations;

---

[19] https://investor.endo.com/news-releases/news-release-details/endo-reports-first-quarter-2022-financial-results
[20] https://investor.endo.com/static-files/fc4989b0-2393-4a9a-8fb7-398730d72dc6
[21] *See Declaration of Ray Dombrowski in Support of Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing and (IV) Granting Related Relief* [D.I. 18] ¶ 10.

- Endo has consistently outperformed projections;

- Endo is not facing any near-term events in opioid litigation;

- Endo has recently entered into a number of manageable out-of-court settlements of its opioid liabilities; and

- Endo entered chapter 11 with the intent to sell all its assets to some of its first lien creditors in a sale that is likely to leave junior creditors and equity holders with no recovery.

For the debtors, closing that § 363 sale would constitute a "successful reorganization," but it is doubtful that junior creditors, left without the usual protections of a plan of reorganization—a disclosure statement governed by § 1125, the right to vote on a plan, and a plan that meets the confirmation requirements of § 1129—would view it in the same light. Certainly this junior creditor does not. While this is not the time to discuss all the deficiencies in the debtors' vision of a successful reorganization, it is fair to say that the debtors have not met their burden of proving that without the extensive, broad, and overreaching injunction they request, they would not have the likelihood of a successful reorganization.

Immediate Irreparable Harm

Likewise, debtors have not and cannot prove that without the preliminary injunction they will suffer immediate, irreparable harm. This adversary proceeding, seeking the issuance of an injunction for 270 days, was brought against 3198 defendants. The deadline for filing answers has passed and only two answers have been filed: that of the State of Oregon, and another on behalf of another 95 defendants.[22]

Debtors' cries that the sky is falling—or rather, that the sky will fall—if a preliminary injunction is not issued immediately can now be reviewed pragmatically: what exactly would be

---

[22] 67 of those 95 defendants are Underlying Plaintiffs/Governmental Defendants in one case, *City of Alma Georgia v. Purdue Pharma et. al.* 400031/2019, consolidated 400000/2017, Supreme Court of the State of New York, County of Suffolk.

required of debtors' management to deal with the probably fewer than 30 actions that would not be enjoined by default? It can hardly be the type of immediate irreparable harm that would justify granting relief that is "extraordinary" and the type of injunction which should be granted "only sparingly and in limited circumstances." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Balance of Harms

The potential harm to the debtors if required to defend a reduced Multnomah County Action is relatively small, as the discovery burden is almost eliminated by the deletion of the negligence and nuisance claims. The harm to the people of Oregon, though, still vulnerable to sales of Endo opioids almost a year after the complaint was filed, continues unabated.

Public Policy

Finally, the balance of equities tips in the State's favor precisely because the public policy implicated herein is so significant—i.e., the ability of a state to protect the health and safety of its own citizens, including the ability to exercise its police and regulatory powers. Any hypothetical prejudice to the debtors based on what "could" happen (although unlikely to happen) is far outweighed by the non-theoretical prejudice to Oregon.

**Inclusion of Voluntary Operating Injunction**

Including the voluntary operating injunction (the "VOI") as an exhibit to the proposed order in the motion for a preliminary injunction in an adversary proceeding is completely improper. This is a matter that should have been filed in the main case, noticed to all creditors, set for hearing with all creditors having an opportunity to be heard on the matter. The OCC's objection points out some of the deficiencies with the VOI, with which Oregon agrees in large part, but separate from the specific issues of the VOI itself is the method of its presentation to the court

and what it says about these debtors and the so-called "transparency" of the reorganization efforts this case is supposed to embody.

Such a broad operating injunction is a matter for the main case and all creditors.  It is not appropriate that it find its way to the court in an adversary proceeding, and with respect to a motion in that adversary proceeding—not even as an appendix to that motion, but as an appendix to a proposed order in a motion in an adversary proceeding, and then barely mentioned in the 42-page memorandum in support of the motion.

This method of presenting the VOI says that we are still dealing with the same Endo, a company trying to slip something by, hoping that everyone would not notice.  Oregon has had its own experiences with Endo and its counsel failing to be forthcoming and complete in responding to discovery requests.  Oregon's Civil Investigative Demand 6, issued September 18, 2017, requested information concerning the number of sales representatives who detailed Endo opioid medications nationally and in each participating state.  On November 16, 2017, Endo, through its counsel Arnold & Porter, provided documents with information for calls between 2008 and 2017. The cover letter specifically said, "Additionally, we have confirmed that such data does not exist for the time period prior to 2008."  When Oregon learned that such data existed and questioned in August 2021 about the failure to provide call notes from the pre-2008 period, no explanation was given.  Endo offered only to dump all documents produced by Endo in every opioid case nationwide.

**Deficiencies of Voluntary Operating Injunction**

The voluntary operating injunction, negotiated with some number of states, purports to protect the public from the risk of any future misconduct by Endo.  That there is such a risk is evident, if history serves as a guide—Endo engaged in a deceptive, misleading, and false marketing campaign lasting over a decade.  Debtors misrepresented the risks and benefits of opioids to health care providers in the face of scientific evidence and repeated rulings by the FDA informing them that those claims were misleading and false.

In its most basic form, the VOI consists of:

- Endo promising not to lie about opioids again;

- Endo agreeing not to manufacture high dose opioids, except for injectables used in inpatient settings;

- Endo agreeing not to promote opioids to health care providers, patients, or others involved in determining formularies;

- Endo agreeing not to promote opioids by providing speakers or events;

- Endo agreeing not to provide financial or in-kind support for promotional material for opioids;

- Endo agreeing not to provide financial or in-kind support for advertisements for opioids;

- Endo agreeing not to engage in Internet search engine optimization designed to promote opioids;

- Endo agreeing not to provide financial incentives to its sales and marketing employees or to discipline its sales and marketing employees based upon sales volume of opioid products;

- Endo agreeing not to offer or pay any kickback, bribe, or rebate, directly or indirectly in return for the prescribing, sale or use of an opioid;

- Endo agreeing not to lobby for the enactment of any federal, state, or local legislative or regulatory provision that encourages or requires health care providers to prescribe opioids or sanctions them for failing to prescribe opioids or that pertains to the classification of any opioid product as a scheduled drug under the Controlled Substances Act;

- Endo agreeing not to lobby against the enactment of any federal, state, or local legislative or regulatory provision on a variety of related opioid issues; and

- Endo agreeing not to participate, directly or indirectly, in any discount, coupon, or rebate program for any opioid product.

And the method to monitor Endo's compliance with these promises?  **There is none.**  And the consequence for Endo breaching any of these agreements?  Any Participating State (one of which has already settled) can notify Endo of an alleged violation and give Endo 30 days to respond. Endo will then give a good faith written response.  If not satisfied, a Participating State can bring a separate civil action to enforce compliance.  **This is hardly any enforcement for a Participating State, and none at all for any other interested party.**

Unlike Purdue and Mallinckrodt, two previous bankruptcy cases of opioid manufacturers that continued in business, Endo's VOI contains no provision for an independent third-party monitor.  The Mallinckrodt monitor was tasked with filing a report regarding the debtor's compliance with the terms of its agreement within 75 days of appointment with additional reports to follow every 90 days thereafter.  Before issuing any report, the monitor was to confer with the debtor, the settling states, and the OCC regarding its preliminary findings and the reasons for those findings; Mallinckrodt had the right to submit written comments to the monitor, which comments were appended to the final version of the monitor's reports.

This system provides information to all constituencies while ensuring that the debtor's point of view is not overlooked.  This case cries out for an outside, independent monitor to evaluate and monitor Endo's compliance with the Voluntary Operating Injunction.  Especially given the historical difficulties in obtaining full disclosures from Endo, neither the court nor the other constituent bodies can sit back and rely that Endo or its successor(s) will comply without supervision.

A robust document repository that shines light on the misconduct that led to the opioid epidemic is as critical as any payment likely to result from this bankruptcy. The public harm caused by Endo is enormous and whatever money this bankruptcy produces will never compensate for that harm.  The best we can do is to provide some justice for the victims through a full airing of the facts.  A robust document repository will allow scholars, journalists, victims, and the public to study the history and origins of the opioid epidemic so that nothing like it ever happens again.  Endo played a key role in the opioid epidemic and its documents are necessary to

tell the full story.  To that end, there must be a robust document depository, including the same type of privileged documents covered by Purdue's injunction.

## **CONCLUSION**

Oregon respectfully requests that the court: (i) deny the motion for the preliminary injunction as to the Multnomah County Action; (ii)  modify the Voluntary Operating Injunction to include provisions for an independent monitor and for a robust document depository; and (iii)  grant such other and further relief as this court deems just and proper.

ELLEN F. ROSENBLUM  OSB #753239
Attorney General

/s/ Carolyn G. Wade
Carolyn G. Wade  OSB #832120
Senior Assistant Attorney General
Of Attorneys for State of Oregon
Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Telephone:  (503) 934-4400
Facsimile:  (503) 373-7067
E-mail:  carolyn.g.wade@doj.state.or.us

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2022, a true, correct, and complete copy of the

foregoing State of Oregon Objection to Debtors' Motion for Preliminary Injunction [Adv. D.I. 2]

was served on the parties below as indicated:

**By E-Notice:**

- **Aaron R. Cahn**    cahn@clm.com,
  cahn@clm.com;bankruptcy@clm.com;CourtMail@clm.com

- **Abigail Elizabeth Davis**    abigail.sheehan@skadden.com,
  andrea.bates@skadden.com;annie.morelli@skadden.com;jacob.lefkowitz@skadden.com;
  nicholas.hagen@skadden.com;wendy.lamanna@skadden.com;
  christopher.heaney@skadden.com

- **Mark Tate**    tlgservice@tatelawgroup.com

/s/ Carolyn G. Wade
Carolyn G. Wade  OSB #832120
Senior Assistant Attorney General
Oregon Department of Justice